**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

    **Plaintiff,**

        **v.**                **Civil No.** 15-2328 (FAB)

PUERTO RICO INDUSTRIAL
DEVELOPMENT COMPANY,

    **Defendant.**

**OPINION AND ORDER**

BESOSA, District Judge.

Before the Court are plaintiff United States' and defendant Puerto Rico Industrial Development Company ("PRIDCO")'s cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). (Docket Nos. 142 and 143.) The United States also moves to limit the scope of judicial review. (Docket No. 138.) For the reasons set forth below, the United States' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, PRIDCO's motion for summary judgment is **DENIED**, and the United States' motion to limit the scope of judicial review is **DENIED WITHOUT PREJUDICE**. (Docket Nos. 138, 142 and 143.)

I.    **Background**

This matter concerns contaminated groundwater located on property belonging to PRIDCO in Maunabo, Puerto Rico (hereinafter,

the "property").[1]  The United States asserts that PRIDCO is liable

for "all response costs, including enforcement costs, incurred by

the [Environmental Protection Agency, ("EPA")] in connection with

the [Maunabo Area Groundwater Contamination Superfund Site]"

pursuant to the Comprehensive Environmental Response, Compensation

and Liability Act ("CERCLA"), 42 U.S.C. § 9607 *et seq*.  (Docket

No. 8 at p. 7.)

Congress drafted CERCLA in 1980 to address the release or

threatened release of hazardous substances into the environment.[2]

42 U.S.C. § 9601 *et seq*.  CERCLA permits the United States to

allocate funds from a "Hazardous Substance Superfund" to finance

cleanup efforts.  26 U.S.C. § 9507.  The United States may

replenish the Hazardous Substance Superfund pursuant to

section 9607 of CERCLA by bringing suit against, among others,

"any person who at the time of disposal of any hazardous substances

owned or operated any facility at which hazardous substances were

disposed of."  42 U.S.C. § 9607(a); <u>United States v. Bestfoods</u>,

---

[1] The property is located in the "southeastern coastal area of Puerto Rico . . . . surrounded by mountains to the north, east, and west and the Caribbean Sea to the southwest." (Docket No. 139, Ex. 2 at p. 21.)  The Municipality of Maunabo identifies the property as L-283-0-06.  (Docket No. 11 at p. 2.)  PRIDCO owns a second parcel of land that is also located in Maunabo, identified as Lot-304-0-66.  (Docket No. 101, Ex. 15 at p. 17.)  This second parcel of land is unrelated to the CERCLA cause of action.

[2] Jurisdiction exists in this action pursuant to 42 U.S.C. § 9613(b), providing that the "United States district courts shall have exclusive original jurisdiction over all controversies arising under [CERCLA]."

524 U.S. 51, 55 (1998) ("CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites.") (citation omitted).[3]

## A.   Hazardous Substances Are Located on PRIDCO's Property

PRIDCO is a government instrumentality of the Commonwealth of Puerto Rico, incorporated in 1942 to stimulate the formation of local firms and to attract foreign investment. (Docket No. 11 at p. 2; Docket No. 117, Ex. 3 at p. 2.)   To accomplish these ends, PRIDCO maintains an infrastructure development program, and facilities for lease or sale to qualified investors. (Docket No. 117, Ex. 3 at p. 2.)   The property, which PRIDCO acquired in 1964, is among these facilities.   (Docket No. 117, Ex. 4 at p. 2.)[4]

---

[3] CERCLA empowers the President of the United States to "remove or arrange the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time."   42 U.S.C. § 9604(a)(1). President Ronald Reagan first delegated the authority to implement CERCLA to the EPA pursuant to Executive Order 12580 (January 23, 1987).   Section 1 of Executive Order 12580 requires the National Contingency Plan ("NCP") to provide for national and regional response teams to coordinate preparedness and response actions.

[4] Between 1969 and 2015, PRIDCO leased the property to:  (1) System Engineering Labs (1969 through 1971); (2) Coulter de Puerto Rico (1972 through 1980); (3) Solar Mar of Puerto Rico (1980 through 1984); (4) Orle International Company (1986 through 1989); (5) Puerto Rico Housing Department (1989 through 1991); (6) Municipality of Maunabo (1996 through 1998); (7) Premium Fruit Company (1999 through 2003); (8) E.I.G. Aqua Pura de Puerto Rico, Inc; (9) Juan Orozco, Ltd. (date of lease not specified); and (10) Centro de Acopio Manufacturing (date of lease not specified).  (Docket No. 101-15 at p. 4.)

The Puerto Rico Aqueduct and Sewer Authority ("PRASA") operates four groundwater supply wells in Maunabo, providing water to 14,000 people.  (Docket No. 101, Ex. 6 at p. 12.)  One of the four PRASA wells is located adjacent to the southern edge of the property (hereinafter, "Maunabo well").  (Docket No. 101, Ex. 14 at p. 17.)  Between 2001 and 2004, PRASA detected volatile organic compounds ("VOC"), including trichloroethylene ("TCE") and cis-1, 2-dichloroethene ("cis-1, 2-DCE"), in the public water supply.[5] (Docket No. 101, Ex. 3 at p. 23.)  TCE and cis-1, 2-DCE are hazardous substances.  Id.  In 2002, PRASA discovered that groundwater from the Maunabo well contained TCE and cis-1, 2-DCE. (Docket No. 101, Ex. 6 at p. 12.)  PRASA installed a carbon filtration system to treat the contaminated groundwater.  (Docket No. 101, Ex. 2 at p. 3.)[6]

The EPA and the Puerto Rico Environmental Quality Board ("EQB") are responsible for the decontamination of the groundwater.  (Docket No. 101, Ex. 6 at pp. 12—13.)  The EPA confirmed that the groundwater from the Maunabo well is

---

[5] TCE is a chlorinated solvent that degrades into cis-1, 2-DCE upon disposal into the environment.  (Docket No. 101, Ex. 6 at p. 12.)

[6] The Puerto Rico Department of Health ("PRDOH") ordered PRASA to discontinue use of the Maunabo well in 2002.  (Docket No. 101-3 at p. 11.)  Rather than close the Maunabo well, however, PRASA installed carbon filtration tanks.  Id. According to CMD Smith, a firm hired by the EPA to study the contaminated groundwater, this system "was not always effective and [. . .] contaminated drinking water was reaching the consumers."  Id.

contaminated primarily with cis-1, 2-DCE.  Id. at p. 26.  After
further investigation, the EPA discovered three plumes of
contaminated groundwater throughout the Municipality of Maunabo.
(Docket No. 101, Ex. 5 at p. 171.)  The three plumes are referred
to as:  (1) cis-1, 2-DCE, (2) PCE, and (3) 1, 1-DCE.  (Docket
No. 101, Ex. 5 at p. 171.)  The cis-1, 2-DCE plume is located below
the property, "flow[ing] southwest toward [a] river, but is
intercepted by [the Maunabo well]."  (Docket No. 101, Ex. 6 at
p. 26; Docket No. 101, Ex. 3 at p. 14.)  The PCE plume is located
south of the PRIDCO property near a former sugar mill.  (Docket
No. 101, Ex. 4 at p. 18.)  The 1, 1-DCE plume is located northwest
of the property.  (Docket No. 101, Ex. 6 at p. 12.)  Together, the
three plumes comprise the Maunabo Area Groundwater Contamination
Superfund Site (hereinafter, "the site").  (Docket No. 101, Ex. 6
at p. 12.).[7]  The EPA placed the site on the National Priorities
List, a compilation of the most contaminated sites in the United
States.  Id. at p. 15.[8]

        The EPA issued the Record of Decision ("ROD") in 2012,
setting forth the "factual and legal basis for selecting the

---

[7] The United States is not requesting reimbursement for costs in connection with
the two plumes of groundwater located beyond the PRIDCO property.

[8] The 2019 National Priorities List includes the Maunabo Area Groundwater
Contamination Superfund Site.  Superfund: National Priorities List (NPL),
(Feb. 5, 2019) available at https://www.epa.gov/superfund/superfund-national-
priorities-list-npl (last visited March 25, 2019).

[applicable] remedy." (Docket No. 139, Ex. 2 at p. 7.)[9]  The remedy selected by the EPA incorporates air sparging for the cis-1, 2-DCE plume and monitored natural attenuation for the PCE and 1, 1-DCE plumes. (Docket No. 101, Ex. 6 at p. 75.)[10]

The United States commenced this action on September 23, 2015. (Docket No. 21.) The Court granted the United States' motion to trifurcate this litigation into a Liability Phase ("Phase I"), a Cost Phase ("Phase II"), and a Contribution Phase ("Phase III"). (Docket No. 85.)

**B.    Phase I: PRIDCO is *Prima Facie* Liable for the Release of Hazardous Substances**

The United States moved for summary judgment as to liability in Phase I. (Docket No. 101.) PRIDCO opposed summary judgment, emphasizing that "the technical data available to date

---

[9] The EPA is required to issue a Record of Decision. 42 U.S.C. § 9617; 40 C.F.R. § 300.430. These documents "provide a comprehensive description of site conditions, the scope of the action, and the Selected Remedy, cleanup levels, and the reason for selecting the remedy." A Guide to Preparing Superfund Proposed Plans, Records of Decision, and Other Remedy Selection Decision Documents, (July 1999) (available at https://www.epa.gov/superfund/record-decision-rod-guidance) (last visited March 25, 2019).

[10] According to the ROD, "air sparging is a technology in which air is injected into the subsurface through sparge points. The injected air acts to remove or 'strip' the VOCs from the groundwater." (Docket No. 139, Ex. 2 at p. 34.) Monitored Natural Attenuation is a "cleanup method that relies on physical, chemical, or biological processes that, under favorable conditions, act without human intervention to reduce the amount, toxicity, or mobility of contamination in soil of groundwater." United States Environmental Protection Agency Use of Monitored Natural Attenuation at Superfund, RCRA Corrective Action, and Underground Storage Tank Sites, Directive 9200.4-17P (April 21, 1999) (available at https://www.epa.gov/sites/production/files/2014-02/documents/d9200.4-17.pdf) (last visited March 25, 2019).

does not support the proposition [that the property] is the source
of contamination." (Docket No. 116 at p. 5.)[11]   The source of
contamination, however, is immaterial to the *prima facie* liability
analysis.   See <u>Robertshaw Controls Co. v. Watts Regulator Co.</u>, 807
F. Supp. 144, 153 (D. Me. 1992) ("Congress specifically rejected
including a causation requirement in Section 9607."). CERCLA
"sketches the contours of a strict liability regime." <u>Acushnet</u>
<u>Co. v. Mohasco</u>, 191 F. 3d 69, 74 (1st Cir. 1999); <u>see</u> <u>United States</u>
<u>v. Monsanto</u>, 858 F.2d 160, 161 (4th Cir. 1988) ("We agree with the
overwhelming body of precedent that has interpreted [CERCLA] as
establishing a strict liability scheme."). CERCLA contains no

---

[11] The EPA collected subsurface soil samples from the areas adjacent to the Juan
Orozco and Puerto Rico Beverage buildings on PRIDCO's property. (Docket
No. 139, Ex. 2 at p. 14.) The soil contained "non-detect values for contaminants
previously detected in the Maunabo public water supply." <u>Id.</u> The groundwater
below the subsurface soil, however, contained hazardous substances
"represent[ing] a risk to human health and the environment." <u>Id.</u> at p. 18.
PRIDCO questioned "how the contaminants may have leaked into the groundwater
without leaving any path of contamination or trace through the soil in the
surface or subsurface of [its] property." (Docket No. 143 at p. 2.) The EPA
held a public meeting on August 29, 2012 regarding the Maunabo Area Groundwater
Contamination Superfund Site. (Docket No. 139, Ex. 3 at pp. 203—204.) At this
meeting, the EPA represented that "[it had] not detected a source contamination
. . . there is no source of the existing contamination. Where it comes from,
the origin, it is unknown." (Docket No. 139, Ex. 3 at pp. 203—204.)
Subsequently, the EPA retained Al Medine ("Medine") as an expert in
environmental engineering. Medine asserts that the "lack of vadose zone soil
contamination in the area near the source areas is caused by the contaminate
fate processes/migration and enhanced by the high precipitation and high
temperature of the Maunabo area." (Docket No. 142, Ex. 8 at p. 168.) Raúl
Colón ("Colón") is a civil engineer with a concentration in water resources.
(Docket No. 142, Ex. 3 at p. 8.) Colón rejects the opinions presented by
Medine, asserting that the "tropical conditions of the Island of Puerto Rico
[are] not a reliable explanation of why none of the chlorinated solvents of
concern have been detected at the PRIDCO Property soils." <u>Id.</u> at p. 28.
According to Colón, the sources of the cis-1, 2-DCE plume "identified by the
EPA at the PRIDCO property appears to originate to the north . . . at the
Navarro property." <u>Id.</u> at p. 39.

causation element. Prisco v. A & D Carting Corp., 168 F. 3d 593,
606 (2d Cir. 1999) ("No causation is needed, however, to establish
liability under CERCLA.") (internal citation omitted).
Accordingly, the Court held that PRIDCO is *prima facie* liable for
the release of hazardous substances on its property. United States
v. P.R. Indus. Dev. Co., 287 F. Supp. 3d 133 (D.P.R. 2017) (Besosa,
J.).[12]   The Court permitted PRIDCO, however, to assert certain
affirmative defenses in Phase II. Id. at 153.   The parties later
filed cross-motions for summary judgment as to the availability of
the third-party defense. (Docket Nos. 142 and 143.)   The United
States also moves for summary judgment regarding costs, seeking to
recover $5,398,161.04 from PRIDCO. (Docket No. 142 at p. 13.)

## II.  Standard of Review

A court will grant summary judgment if "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute
is genuine if the evidence about the fact is such that a reasonable
jury could resolve the point in the favor of the non-moving party.

---

[12] The United States prevailed in Phase I by establishing that: (1) the property
is a facility pursuant to section 107(b) of CERCLA, (2) PRIDCO falls within one
of four categories of covered persons pursuant to section 107(a); (3) a release
or threatened release occurred on the property; and (4) the release or
threatened release caused the United States to incur response costs that are
not inconsistent with the National Contingency Plan. 42 U.S.C. § 107; Acushnet
Co., 191 F.3d at 75 ("By and large, a person who falls within one of the four
categories defined in [section 107] is exposed to CERCLA liability.").

A fact is material if it has the potential of determining the outcome of the litigation." Dunn v. Trs. of Bos. Univ., 761 F.3d 63, 68 (1st Cir. 2014) (internal citation omitted).

The role of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Tobin v. Fed. Exp. Corp., 775 F.3d 448, 450 (1st Cir. 2014) (internal citation omitted). The party moving for summary judgment has the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact" with definite and competent evidence. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994). The movant must identify "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any'" which support its motion. Celotex, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).

Once a properly supported motion has been presented, the burden shifts to the nonmovant "to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (internal citation omitted). "When the nonmovant bears the burden of proof on a particular issue, [he or] she [or it] can thwart summary judgment only by identifying competent evidence in the

record sufficient to create a jury question." Tobin, 775 F.3d at 450-51. A court draws all reasonable inferences from the record in the light most favorable to the nonmovant, but it disregards unsupported and conclusory allegations. McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014).

When parties file cross-motions for summary judgment, a court must "consider each motion separately, drawing all inferences in favor of each non-moving party in turn." AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 3 (1st Cir. 2015) (quoting D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011)). "Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply 'require [the Court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.'" Wells Real Estate Inv. Tr. II, Inc. v. Chardón/Hato Rey P'ship, 615 F.3d 45, 51 (1st Cir. 2010) (quoting Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001)).

**III. Summary Judgment as to PRIDCO's Affirmative Third-Party Defense is Warranted**

The United States moves to foreclose PRIDCO from asserting the third-party defense.  Docket No. 142; 42 U.S.C. § 9607(b).[13] PRIDCO argues, however, that the third-party defense defeats CERCLA liability because "it is presently unknown from a scientific and technical perspective, where the true source of the contamination is [located]."  (Docket No. 143 at p. 2.)  PRIDCO's arguments are unavailing.

**A.    The Third-Party Defense**

The third-party defense provides PRIDCO with a potential reprieve from the strict liability scheme in CERCLA.  To invoke this defense, PRIDCO must establish by a preponderance of the evidence that "an act or omission of a third party other than an employee or agent of [PRIDCO], or than one whose act or omission occurs in connection with a contractual relationship" caused the

---

[13] PRIDCO previously invoked the Act of God and secured creditor defenses.  42 U.S.C. § 9607(b).  (Docket No. 11 at pp. 7–8.)  An Act of God is an "unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight."  42 U.S.C. § 9601(1).  The security creditor defense extends to any "person that is a lender that without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility."  42 U.S.C. § 9601(20)(E); P.R. Indus. Dev. Co., 287 F. Supp. 3d at 150 ("Banks possessing mortgages only to secure loan payments, for example, represent the entities that Congress intended to exempt from liability.") (citation omitted).  The Court has already held that PRIDCO is ineligible for both defenses.  Id. at 147.

groundwater contamination.   U.S.C. § 9607(b)(3).[14]   CERCLA sets
forth two variations of the third-party defense:  (1) the innocent
landowner defense, and (2) the contiguous property defense.
42 U.S.C. 9607(b)(3) and (q); United States v. A & N Cleaners &
Launderers, 854 F. Supp. 229, 238 (S.D.N.Y. 1994) (holding that
"the Innocent Landowner Defense" is a "special case of the Third
Party Defense"). To trigger the innocent landowner defense, PRIDCO
must demonstrate that it "purchase[d] property without knowledge
that a predecessor in the chain of title had allowed hazardous
substances to be disposed on the property." Domenic Lombardi
Realty, 290 F. Supp. 2d 198, 208 (D.R.I. 2008) (citation omitted).[15]
The contiguous property defense requires PRIDCO to establish that
it "did not cause, contribute, or consent to the release or
threatened release" of hazardous substances originating from
property with which PRIDCO is unaffiliated.   42 U.S.C.
§ 9607(q)(1)(A)(i);  Wilson Rd. Dev. Corp. v. Fronabarger

---

[14] The term "contractual relationship" encompasses "land contracts, deeds, easements, or other instrument transferring title or possession."  42 U.S.C. § 9601(35)(A).

[15] PRIDCO must also establish that it "took all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice," and exercised due care regarding the hazardous substances once the contamination was discovered.  42 U.S.C. § 9607(b)(3); 42 U.S.C. § 9601(35)(A)-(B).

Concreters, Inc., 971 F. Supp. 2d 896, 913 (E.D. Mo. 2013).[16]  Both defenses obligate PRIDCO to prove that "a totally unrelated third party is the *sole* cause of the release."  O'Neil v. Picillo, 682 F. Supp. 706, 728 (D.R.I. 1988) (emphasis in original) (citation omitted).

**B.    PRIDCO is Not Eligible to Invoke the Third-Party Defense**

PRIDCO misconstrues the third-party defense by repeatedly assigning the burden of proof to the United States. (Docket Nos. 143, 153 and 161.)  The linchpin of PRIDCO's third-party defense is that the United States "lacks any physical or hard evidence to demonstrate that [PRIDCO's] property is the source of contamination [of] the cis-1, 2-DCE plume."  (Docket No. 143 at pp. 9-10.)  Pursuant to CERCLA, however, PRIDCO shoulders the burden of proving that acts or omissions of an unrelated third-party were the sole cause of the groundwater contamination.  42 U.S.C. § 9607(b)(3).  See Domenic Lombardi Realty, Inc., 290 F. Supp. 2d at 209 ("In order to take advantage of the innocent landowner defense, Lombardi Realty must first meet the threshold burden of proving that the contamination at the Site was caused solely by an act or omission of a third party.") (internal citation

_____

[16] The contiguous property owner defense also requires PRIDCO to establish that it took remedial measures after discovering the contaminated groundwater.  42 U.S.C. § 9607(q)(A)(v)(II).

and quotation omitted); <u>Foster v. United States</u>, 922 F. Supp. 642,
654 (D.D.C. 1996) ("A defendant's failure to meet its burden on
any one of the required elements precludes application of [the
third-party defense].") (citation omitted); <u>United States v. Poly-
Carb, Inc.</u>, 951 F. Supp. 1518, 1531 (D. Nev. 1996) ("Defendant
bears the burden of producing evidence (at the summary judgment
stage) that a third party was the sole cause and that this third-
party had no 'relationship' with [the] Defendant within the meaning
of § 9607(b)(3).") (citation omitted).[17]   This PRIDCO has not done.

     Moreover, the National Contingency Plan provides that
"persons seeking to establish [the third-party defense] must
conduct investigations . . . to identify conditions indicative of
releases or threatened releases."  40 C.F.R. § 312.1(c).[18]

---

[17] The United States need not identify the source of contamination to establish
liability.  <u>See Fairchild Indus., Inc.</u>, 766 F. Supp. 404, 415 (D. Md. 1991)
("The government need not trace each defendant's waste to a specific release
and response."); <u>Kelly v. Thomas Solvent Co.</u>, 727 F. Supp. 1532, 1540 (W.D.
Mich. 1989) (holding that defendants could not avail themselves of the third-
party defense because they "have not shown any evidence, nor have they argued,
that a third party was the sole cause of the release and concomitant harm");
<u>Acme Printing Ink Co. v. Menard, Inc.</u>, 870 F. Supp. 1465, 1480 (E.D. Wis. 1994)
(third-party defense inapplicable because "the undetermined third-party was not
the *sole* cause of the release").

[18] According to the United States, the EPA "determined that the groundwater
plume at issue originates from the PRIDCO property, . . . and this Court affirmed
that finding." (Docket No. 139 at pp. 4—5.)  This statement is incorrect.  The
Court merely held that a "release" of hazardous substances occurred on PRIDCO's
property.  <u>P.R. Indus. Dev. Co.</u>, 287 F. Supp. 3d at 145.  Indeed, the Court
permitted PRIDCO to assert the third-party defense in Phase II of this
litigation precisely because "further factual development as to the cause of
the release [was] necessary before the Court [could] determine whether summary
judgment is justified as to these defenses." <u>Id.</u> at 148-9.

PRIDCO emphasizes that the source of contamination is unknown.  (Docket No. 143 at p. 45.)   This proposition only underscores that the third-party defense is inapplicable. Contending that the "**likely source** of contamination is not within the PRIDCO property, but rather, at the upgradient property of Navarro" is insufficient.  (Docket No. 153 at p. 2) (emphasis added); Fairchild Indus., 766 F. Supp. at 411 ("The detailed provisions of [Section 9607(b)(3)] demonstrate that Congress did not intend there to be a general third-party defense; instead, a party must allege and prove a specific set of facts [among which are]:  that the third party was the sole cause of the release; [and] that the third party was not an employee or agent of the defendant.").  The third-party defense is triggered only by proving that the **sole cause** of contamination originated with an unrelated third-party, not that a third-party likely caused or contributed to the contamination.  47 U.S.C. § 9607; see Monsanto Co., 858 F.2d at 168 ("Section 107(b)(3) sets forth a limited affirmative defense based on the complete absence of causation."); City of Bangor v. Citizens Co., 437 F. Supp. 2d 180, 213-14 (D. Me. 2006) (holding utility company liable pursuant to CERCLA despite repeated suggestions that "no fewer than eight other sources" caused the contamination).

PRIDCO also maintains that establishing liability without identifying the source of contamination "is not in the spirit of CERCLA." (Docket No. 143 at p. 25.) The Court disagrees. CERCLA is a comprehensive and at times severe statute, holding property owners strictly liable for hazardous substances located on their property. See Consolidation Coal Co. v. Ga. Power Co., 781 F.3d 129, 156 (4th Cir. 2015) (holding that CERCLA "must be given a broad interpretation to effect its ameliorative goals . . . even if faithful application of CERCLA may . . . yield seemingly harsh results") (citations omitted); A & N Cleaners & Launders, 854 F. Supp. at 241 ("CERCLA's narrow affirmative defenses do little to alleviate the unfairness of the statute's liability scheme, particularly in cases where liability is predicated solely on property ownership."). In enacting CERCLA, however, "Congress had well in mind that persons who dump or store hazardous waste sometimes cannot be located or may be deceased or judgment-proof." New York v. Shore Realty Corp., 759 F.2d 1032, 1045 (2d Cir. 1985) (citation omitted). CERCLA addresses environmental threats to public safety by "[creating] a strong incentive for both prevention of releases and voluntary cleanup of releases by responsible parties." United States v. Twp. of Brighton, 152 F.3d 307, 330 (6th Cir. 1998); United States v. Mex. Feed & Seed Co., 980 F.2d 478, 484 (8th Cir. 1992) (noting that for CERCLA, the "focus is on

responsibility, not culpability"); <u>Commander Oil Corp. v. Barlo Equip. Corp.</u>, 215 F.3d 321, 327 (2d Cir. 2000) ("The scheme envisioned by Congress protects taxpayers generally from bearing the costs of nationwide cleanup . . . instead, potentially responsible parties must shoulder the frequently heavy burden of environmental liability.") (citation omitted).

Holding PRIDCO liable for response costs pertaining to the cleanup of the cis-1, 2-DCE plume is consistent with Congress's intent to promote expeditious remediation at contaminated sites, adequate compensation to public coffers, and the imposition of accountability.  See <u>United States v. Davis,</u> 261 F.3d 1, 26-7 (1st Cir. 2001).  Because PRIDCO failed to raise a genuine issue of material fact as to whether a third-party was the sole cause of the contamination, the United States is entitled to response costs. See <u>Domenic Lombardi Realty, Inc.</u>, 290 F. Supp. 2d at 207 ("[U]nless Lombardi Realty can take advantage of one of CERCLA's defenses, it will be liable for the clean-up costs incurred by the EPA.").  Phase I (Liability) of this action is complete.

**IV.  Phase II:  The United States Seeks $5,398,161.04 in Response Costs**

According to the United States, "there is no question of material fact that [it] incurred at least $5,398,161.04 through February 28, 2018 in response costs related to the cis-1, 2-DCE

plume." (Docket No. 142 at p. 9.) Because PRIDCO is liable for the contaminated groundwater, the United States is entitled to "all costs of removal or remedial action . . . not inconsistent with the national contingency plan." 42 U.S.C. § 9607(1)(4)(A). Accordingly, two factors are relevant to the cost analysis: (1) the response actions implemented by the United States, and (2) the National Contingency Plan ("NCP").

A.   **National Contingency Plan**

The NCP is "essentially the federal government's toxic waste playbook, detailing the steps that government must take to identify, evaluate, and respond to hazardous substances in the environment." Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 137 (2nd Cir. 2010); 40 C.F.R. § 300.1 ("The purpose of the [NCP] is to provide the organizational structure and procedure for preparing for and responding to discharges of oil and releases of hazardous substances, pollutants, and contaminants."); United States v. Hardage, 982 F.2d 1436, 1442-443 (10th Cir. 1992) ("The NCP regulates choice of response action, not costs . . . Costs, by themselves, cannot be inconsistent with

the NCP").[19]  Costs attributed to removal and remedial actions that are inconsistent with the NCP are not recoverable.  See e.g., In re Bell Petroleum Servs., 3 F.3d 889, 907 (5th Cir. 1993) ("Because the decision to implement an [alternate water supply] was arbitrary and capricious, it is inconsistent with the NCP.  Accordingly, the EPA is not entitled to recover the costs of designing and constructing the [alternate water supply].").

     The Court presumes that the United States implemented removal and remedial actions that are consistent with the NCP. City of Bangor v. Citizens Communs. Co., 532 F.3d 70, 91 (1st Cir.

---

[19] The NCP requires that the EPA consider the following eight factors in selecting a removal action:

    (i)      Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants;

    (ii)     Actual or potential contamination of drinking water supplies or sensitive ecosystems;

    (iii)    Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

    (iv)    High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;

    (v)     Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

    (vi)    Threat of fire or explosion;

    (vii)   The availability of other appropriate federal or state response mechanisms to respond to the release; and

    (viii)  Other situations or factors that may pose threats to public health or welfare of the United States or the environment.

40 C.F.R. § 300.415.

2008) ("Actions undertaken by the federal or a state government
are presumed to not be inconsistent with the NCP."). Consequently,
the burden of proving that the EPA acted inconsistently with the
NCP rests with PRIDCO. United States v. Mottolo, 695 F. Supp. 615,
630 (D.N.H. 1988) ("Defendants have the burden to show that
governmental response costs are inconsistent with the NCP."). To
do so, PRIDCO must "identify a particular provision in the NCP
with which a specific response action is inconsistent," and that
this inconsistency "resulted in demonstrable excess costs for
which [PRIDCO] would not be responsible." United States v. Am.
Cyanamid Co., 786 F. Supp. 152, 162-63 (D.R.I. 1992) (holding that
the defendants failed to establish inconsistency with the NCP
because their "claims and challenges [were] not supported by
reference to the administrative record or through testimony");
Hardage, 982 F.2d at 1444 ("The only way a responsible party can
escape liability for the government's costs incurred at a
particular site is to demonstrate that the government's response
actions — i.e., removal and remedial actions – underlying the
costs, are inconsistent with the NCP.").

          The removal and remedial actions implemented by the EPA
in response to the contaminated groundwater in Maunabo are reviewed
pursuant to an arbitrary and capricious standard. Id.; United
States v. JG-24, Inc., 478 F.3d 28, 32 (1st Cir. 2007) ("[T]he

EPA's decision whether to conduct a removal action is reviewed under the 'arbitrary and capricious' standard."). The arbitrary and capricious standard is "highly deferential" and "narrow;" "the agency's actions are presumed to be valid," and the Court "may not substitute its judgment for that of the agency." River St. Donuts, LLC v. Napolitano, 558 F.3d 111, 114 (1st Cir. 2009). "The relevant inquiry" is "whether the administrative record sufficiently supports the agency's decision." Atieh v. Riordan, 727 F.3d 73, 76 (1st Cir. 2013); Emhart Indus. v. New Eng. Container Co., 274 F. Supp. 3d 30, 78 (D.R.I. 2017) (holding that the "EPA certainly had to make judgment calls along the way, but these decisions deserve deference considering EPA's 'technical expertise and experience'") (quoting Fed. Power Comm'n v. Fla. Power & Light Co., 404 U.S. 453, 465 (1972)).

Judicial review of "any issues concerning the adequacy of any response action" is limited to the administrative record. 42 U.S.C. § 9613(j). The Court's "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973); JG-24, Inc., 478 F.3d at 33—34 ("Under CERCLA, judicial review is limited to the administrative record as it existed at the time of the challenged agency action."); see Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 792 (D.C.

Cir. 1984) ("To review more than the information before the
Secretary at the time she made her decision risks our requiring
administrators to be prescient or allowing them to take advantage
of *post hoc* rationalizations.") (citation omitted).[20]

### B.   Removal and Remedial Costs

Removal and remedial costs are defined liberally,
encompassing expenses incurred throughout the course of
decontamination efforts. W.R. Grace & Co. –Conn. v. Zotos Int'l,
Inc., 559 F.3d 85, 92 (2d Cir. 2009) (citation omitted).[21]
Response actions are "divided into two categories: short term

---

[20] Courts possess the discretion, however, to supplement the record "as an aid
to understanding . . . highly technical, environmental matters." Valley
Citizens for Safe Environment v. Aldridge, 886 F.2d 458, 460 (1st Cir. 1989)
(Breyer, J.) (noting that expert testimony may be necessary to understand
Environmental Impact Statements issued by the EPA). "Failure to explain
administrative action as to frustrate effective judicial review," and a "strong
showing of bad faith or improper behavior" are additional reasons to supplement
the administrative record. See Olsen v. United States, 414 F.3d 144, 155-56
(1st Cir. 2005); Town of Norfolk v. U.S. Army of Eng'rs, 968 F.2d 1438, 1458-
59 (1st Cir. 1992) (citing Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971)).

[21] The NCP provides that:

> During all phases of response, the lead agency shall complete and
> maintain documentation to support all actions taken under the NCP
> and to form the basis for cost recovery. In general, documentation
> shall be sufficient to provide the source and circumstances of the
> release, the identity of responsible parties, the response action
> taken, accurate accounting of federal, state, or private party costs
> incurred for response actions, and impacts and potential impacts to
> the public health and welfare and the environment. Where applicable,
> documentation shall state when the [National Response Center]
> received notification of a release of a reportable quantity.

40 C.F.R. § 300.160.

'removal' actions (to study and to clean up contamination), and permanent or long term 'remedial' actions ('taken instead of or in addition to removal actions')." JACH v. American Univ., 245 F. Supp. 2d 110, 113 (D.D.C. 2003); 42 U.S.C. § 9601(23) and (24).[22] Designation of a specific response as a removal or remedial action is a question of law. Geraghty & Miller, Inc. v. Conoco Inc., 234 F.3d 917, 925 (5th Cir. 2000) (citation omitted). Recoverable costs include indirect and oversight costs. United States v. Ottati & Goss, Inc., 900 F.2d 429, 444 (1st Cir. 1990). PRIDCO is also liable for prejudgment interest and enforcement costs. 42 U.S.C. §§ 9601, 9607(a); Monsanto Co., 858 F.2d at 175. Litigation costs fall within the scope of enforcement costs. See United States v. Northeastern Pharmaceuticals & Chemical Co., 579

---

[22] "Removal" within the meaning of CERCLA includes the:

> Cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). Remedial actions are:

> consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

42 U.S.C. § 9601(24).

F. Supp. 823, 852 (W.D. Mo. 1984) (holding that "defendants are jointly and severally liable for, and the plaintiff is entitled to recover, all litigation costs, including attorney fees, incurred by [the] plaintiff" in a CERCLA action); <u>United States v. Dico</u>, 266 F.3d 864, 878—79 (8th Cir. 2001) ("[Defendant] therefore bears the burden in this [CERCLA] litigation of proving that the government's requested recovery fees, whether attorney fees or otherwise, are inconsistent with the NCP.").

**C.   Summary Judgment as to Costs is Not Appropriate**

Summary judgment as to costs is not warranted for two reasons. First, genuine issues of material fact concerning the final amount of costs are in dispute. Second, the cost assessments presented by the United States are inconsistent. PRIDCO is liable for costs that correspond to response actions. The response actions cited by the United States, however, vary with the circumstances.

**1.   Issues of Material Fact Concerning the Final Amount of Costs are in Dispute**

The evidence proffered by the United States bolsters the Court's determination that summary judgment is not proper. In support of its motion for summary judgment, the United States submitted declarations from Wiley Wright ("Wright"), Bill Kime ("Kime"), and Christopher Osborne ("Osborne"). (Docket

Civil No. 15-2328 (FAB)                                              25

No. 142, Exs. 9—11.)   Wright and Kime are certified public
accountants.   Id., Exs. 9 and 10.   Osborne is employed by the EPA
as a Senior Financial Advisor in the Office of the Controller.
Id., Ex. 11.

The Court concurs with the United States that
"affidavits and cost summaries . . . in support of summary judgment
on the issue of CERCLA cost recovery are admissible and sufficient
to establish the amount of these costs."   Docket No. 142 at p. 11;
see Hardage, 982 F.2d at 1442 (holding that "affidavits of various
EPA and Department of Justice (DOJ) employees charged with
accumulating cost data . . . established a *prima facie* case that
the government is entitled to response costs in the amount of
[$5,441,201.25]"); Carson Harbor Hill, Ltd. v. Uncocal Corp., 287
F. Supp. 2d 1118, 1154 (C.D. Cal. 2003) ("While compliance with
the NCP is a fact question, it can, like any other fact question,
be resolved on summary judgment where the evidence is
undisputed.").   Material facts, however, are in dispute.

Wright concedes that the "EPA is collecting the
work performed documents for five small dollar contracts and two
small dollar cooperative agreements, [all of which] will be
produced to all parties as soon as they are available."   (Docket
No. 142, Ex. 9 at p. 7.)   PRIDCO is entitled to review the accuracy
of these "small" costs, and whether they reflect actions that

comport with the NCP.  An incomplete record cannot sustain summary judgment disposition, particularly when the amount of costs is subject to exact computation.  Union Caribe Corp. v Thiokol Corp., 89 F. Supp. 1035, 1045 (D. Ga. 1994) ("Because the NCP is a complex set of requirements, it is necessary for the Court to have a full factual record before it in order to determine which remedial actions are consistent with the NCP.") (citation omitted); Reardon v. United States, 947 F.2d 1509, 1518 (1st Cir. 1991) (noting that "[w]hether response costs were incurred consistently with the national contingency plan is an issue which may be highly factual").  Accordingly, summary judgment in Phase II is inappropriate.

### 2.   The United States Fails to Designate Which Remedial Actions Underlie Recoverable Costs

In its motion for summary judgment and motion to limit the scope of judicial review, the United States takes inconsistent positions regarding the actions for which PRIDCO must pay.  (Docket Nos. 138 and 142.)

### a.   Costs Requested in the Motion for Summary Judgment

In its motion for summary judgment, the United States contends that the "second phase of this litigation addresses the United States' past response costs." (Docket No. 142 at p. 7.) The United States reiterates that CERCLA permits the recovery of

"all costs of removal or remedial action." Id. at p. 8 (citing 42 U.S.C. § 9607(a)(4)(A)). Consequently, the United States requests that the Court order PRIDCO to remit $5,398,161.04 in costs. Id. at p. 13. According to the United States, this amount represents three categories of costs: (1) payroll and travel expenses, (2) contractor expenses, and (3) a third class of expenses including indirect costs, prejudgment interest, and Department of Justice ("DOJ") costs. (Docket No. 142 at p. 10.)

       According to Kime, the Environmental and Natural Resources Division of the Department of Justice incurred $529,441.79 in costs associated with this action. (Docket No. 142, Ex. 10 at p. 5.) Osborne set forth the method by which the EPA calculates indirect costs, including expenses that "cannot be accounted for on a site-specific basis but are necessary for both the administration and operation of the Superfund program and for site-specific cleanup efforts." (Docket No. 142, Ex. 11 at p. 4.) Wright asserts that "total unreimbursed Site costs incurred . . . through February 28, 2018 are $7,497,445.89." (Docket No. 142, Ex. 9 at p. 7.)[23] Of this amount, the "EPA's total unreimbursed Site TCE-cis-1, 2-DCE Plumes costs incurred (including prejudgment interest) through February 28, 2018 are $5,398,161.04." Id. at

---

[23] Wright included litigation and indirect costs in his calculations. (Docket No. 142, Ex. 9 at p. 7.)

p. 8.[24]  Most of the costs claimed by the United States derive from

$4,183,530.36 in contractor expenses.  Id. at p. 13.[25]  The United

States does not, however, specify what work the contractors

performed.

**b.   Costs Requested in the Motion to Limit Judicial Review**

The United States moves to limit the scope of

judicial review, requesting that "any challenge to the adequacy of

the response actions at the Site be evaluated on the basis of the

administrative record and that [Konard Banaszak's] expert opinion

challenging the EPA's selection of a response action at this Site

be precluded based upon statutory and administrative law

---

[24] Wright refers to the "TCE-cis-1, 2-DCE Plumes" in the plural, as though PRIDCO is liable for multiple plumes of contaminated groundwater.  (Docket No. 142, Ex. 9 at p. 7.)  Of the three plumes that constitute the Maunabo Area Groundwater Contamination Superfund Site, however, this action pertains exclusively to the plume located on PRIDCO's property.

[25] In the amended complaint, the United States also requests "all response costs, including enforcement costs, incurred by the EPA in connection with the Site, including interest thereon."  (Docket No. 8 at p. 9.)

requirements." (Docket No. 138 at p. 3.)[26]  Other than Banaszak's
expert opinion, the United States makes no mention of the specific
documents it seeks to preclude from the administrative record.
Essentially, the United States opposes the Court's consideration
of Banaszak's expert opinion but refrains from proposing records
that are eligible for review.

PRIDCO opposed the United States' motion to
limit the scope of judicial review, noting that the EPA conducted
soil studies on multiple occasions after issuing the Record of
Decision in 2012. (Docket No. 148 at pp. 5—7.) Pursuant to the
NCP, the administrative record shall include, *inter alia*,
"[d]ocuments containing factual information, data and analysis of
the factual information, and data that may form a basis for the

---

[26] Konrad Banaszak ("Banaszak") is the Chief Scientist at Genesis Engineering
and Redevelopment, Inc., retained by PRIDCO to serve as an expert witness.
(Docket No. 139, Ex. 1.) Banaszak asserts that:

[1] The claim by the EPA's expert that 1,2 dichloroethene or
trichloroethene has not been found in the soil at the PRIDCO site
because they have disappeared due to the tropical climate at Maunabo
is not supported by experience or science . . . [2] The most cost
effective and least disruptive way to take care of the 1,2
dichloroethene / trichloroethene plume is through monitored natural
attenuation.

(Docket No. 139, Ex. 1 at pp. 3—6.) The NCP requires the EPA to balance the
following five criteria in selecting a remedy: (1) long-term effectiveness and
permanence, (2) reduction of toxicity, mobility, or volume treatment, (3) short-
term effectiveness, (4) implementability, and (5) cost. 40 C.F.R.
§ 300.430(f)(i)(B); see Am. Cyanamid Co., 786 F. Supp. at 162 ("The NCP directs
EPA to prospectively choose a remedial action that EPA believes will clean-up
the site for the least cost. Once EPA validly chooses a permanent remedy for
a site, cost-effectiveness is no longer a viable challenge to the implementation
of that remedy.").

selection of a response action."   40 C.F.R. § 300.810(a)(1).
PRIDCO posits that the Final Pre-Design Investigation in 2015 and
Pilot Study Report in 2017 were "critical in forming the basis for
the selection of the response action."   Id. at p. 11.   Indeed,
expert witnesses retained by the United States relied on data
published in 2017.[27]

       Despite previous requests to recover "all
costs" associated with the cis-1, 2-DCE plume, the United States
replied that "in this matter [it] is only seeking its past costs,
*i.e.*, primarily the costs of investigating the contamination, in
making the remedy selection, and in conducting enforcement
actions, **but no costs for implementing the selected remedy**."
(Docket No. 159 at p. 1) (emphasis added).   The United States
purports that PRIDCO's arguments regarding the administrative
record "are premature and should be considered only if the United
States brings a future action against PRIDCO seeking to require it
to implement or pay for the remedy for the Maunabo Site."   Id. at
p. 2.   Curiously, the United States reiterates that:

> [It] is not seeking, in this matter, an order requiring
> PRIDCO to implement the 2012 remedy or to recover any
> costs that the EPA itself incurs in implementing the
> 2012 remedy.   The United States will bring such claims,
> if ever, in a future action against PRIDCO.

---

[27] Al Medine asserted that a "detailed review of Investigative contaminant data
collected at the Maunabo Groundwater Contamination Site from 2005 - 2017
confirms the presence of three separate plumes remaining at the Site, including
PCE, TCE/cis-1,2-DCE, and 1,1-DCE plumes."   (Docket No. 142, Ex. 8 at p. 168.)

<u>Id.</u> at p. 3 (emphasis added).[28]

          These statements contradict all previous
pleadings submitted by the United States, including the amended
complaint and motion for summary judgment.  <u>See</u> Docket No. 8 at
p. 9; Docket No. 142 at p. 8.  The EPA initially estimated that
the selected remedy, *i.e.* air sparging for the cis-1, 2-DCE plume
and monitored natural attentional for the reaming two plumes, would
cost $4.9 million.  (Docket No. 139, Ex. 2 at p. 38.)  Wiley Wright
disclosed that the "EPA has provided the majority of work performed
(e.g. contracts, statements of work, and/or work assignment) for
the Site contractor costs."  (Docket No. 142, Ex. 9 at p. 7.)  If
the United States is, indeed, not seeking to recover costs stemming
from air sparging (the remedy), then the costs cited by Wiley
Wright may need to be modified.  Consequently, the critical
question posed by the inconsistent positions articulated by the
United Sates is:  What removal and/or remedial actions implemented
by the EPA to address the cis-1, 2-DCE plume form the basis of the

---

[28] That the United States may sue PRIDCO in the future pursuant to the same
cause of action asserted in this litigation is highly suspect.  <u>See</u> <u>United
States v. Stauffer Chemical Co.</u>, 464 U.S. 165, 169 (1984) ("[W]e agree that the
doctrine of mutual defense collateral estoppel is applicable against the
Government to preclude relitigation of the same issues already litigated against
the same party in another case involving virtually identical facts."); <u>United
States v. Gurley</u>, 43 F.3d 1188, 1196 (8th Cir. 1994) ("We understand that
cleaning up hazardous wastes can be time-consuming and that in this case the
scope of the cleanup was not known until April 1986 . . . But these facts do
not relieve the EPA of its obligation to abide by the requirements of the *res
judicata* doctrine.").

costs requested by the United States?  The United States is **ORDERED** to specify which response actions (*e.g.* removal actions, remedial actions) underlie the costs that it purports PRIDCO is liable for paying.  Trial for Phase II will commence after the United States reconciles the inconsistent cost assessments.  The United States' motion to limit the scope of judicial review is **DENIED WITHOUT PREJUDICE**.  (Docket No. 138.)

## V.   CONCLUSION

For the reasons set forth above, the United States' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. (Docket No. 142.)  PRIDCO's motion for summary judgment is **DENIED**. (Docket No. 143.)  The United States' motion to limit the scope of judicial review is **DENIED WITHOUT PREJUDICE**.  (Docket No. 138.) The United States is **ORDERED** to specify which response actions (*e.g.* removal actions, remedial actions) underlie the costs for which PRIDCO is purportedly liable, and to reconcile its inconsistent cost assessments, **no later than April 25, 2019**.

Trial regarding Phase II, if necessary, will be scheduled by separate order.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, March 25, 2019.

s/ Francisco A. Besosa<br>
FRANCISCO A. BESOSA<br>
UNITED STATES DISTRICT JUDGE