IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    **Plaintiff,**

          v.

PUERTO RICO INDUSTRIAL
DEVELOPMENT COMPANY,

    **Defendant.**

**Civil No.** 15-2328 (FAB)

## OPINION AND ORDER

BESOSA, District Judge.

Before the Court is the United States' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). (Docket No. 142.) The United States seeks to recover $5,398,161.04 from defendant Puerto Rico Industrial Development Company ("PRIDCO") pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607 *et seq*. Id. at p. 13. For the reasons set forth below, the United States' motion for summary judgment is **GRANTED**.

## I. Background

This litigation concerns contaminated groundwater in Maunabo, Puerto Rico (hereinafter, the "property"). PRIDCO is a government instrumentality of the Commonwealth of Puerto Rico, incorporated in 1942 to stimulate the formation of local firms and to attract foreign investment. (Docket No. 11 at p. 2; Docket No. 117, Ex.

3 at p. 2.)  To accomplish these ends, PRIDCO maintains industrial facilities throughout Puerto Rico.  Id.  The property, which PRIDCO acquired in 1964, is among these facilities.  (Docket No. 117, Ex. 4 at p. 2.)

The Puerto Rico Aqueduct and Sewer Authority ("PRASA") operates four groundwater supply wells in Maunabo, providing water to 14,000 people.  (Docket No. 101, Ex. 6 at p. 12.)  Between 2001 and 2004, PRASA detected volatile organic compounds, including trichloroethylene ("TCE") and cis-1, 2-dichloroethene ("cis-1, 2-DCE"), in the water supply.[1]  (Docket No. 101, Ex. 3 at p. 23.) TCE and cis-1, 2-DCE are hazardous substances.  Id.  Subsequently, the United States Environmental Protection Agency ("EPA") identified three plumes of contaminated groundwater throughout the Municipality of Maunabo: (1) the cis-1, 2-DCE plume, (2) the PCE plume, and (3) the 1, 1-DCE plume.  (Docket No. 101, Ex. 5 at p. 171.)  The cis-1, 2-DCE plume is located below PRIDCO's property. (Docket No. 101, Ex. 6 at p. 26.)[2]  Together, the three plumes comprise the Maunabo Area Groundwater Contamination Superfund Site (hereinafter, the "site").  Id. at p. 12.  The EPA placed the site

---

[1] TCE is a chlorinated solvent that degrades into cis-1, 2-DCE upon disposal into the environment.  (Docket No. 101, Ex. 6 at p. 12.)

[2] The United States is not requesting reimbursement for costs relating to the PCE and 1, 1-DCE plumes.

on the National Priorities List, a compilation of the most
contaminated sites in the United States. <u>Id.</u> at p. 15.[3]

       The United States commenced this action on September 25, 2015.
(Docket No. 1.)  The Court granted the United States' motion to
trifurcate this litigation into a Liability Phase ("Phase I"), a
Cost Phase ("Phase II"), and a Contribution Phase ("Phase III").
(Docket No. 85.)  In Phase I, the Court held that PRIDCO is *prima
facie* liable pursuant to CERCLA for all response costs incurred by
the EPA in connection with the cis-1, 2-DCE plume. <u>United States
v. P.R. Indus. Dev. Co.</u>, 287 F. Supp. 3d 133 (D.P.R. 2017) (Besosa,
J.).[4]  The Court granted PRIDCO leave, however, to assert the
third-party defense in Phase II. <u>Id.</u> at 141 and 153.

       PRIDCO and the United States filed cross-motions for summary
judgment regarding the third-party defense.  (Docket Nos. 142 and
143.)  The Court held that the third-party defense is inapplicable,

---

[3] The 2019 National Priorities List includes the Maunabo Area Groundwater
Contamination Superfund Site.  <u>Superfund: National Priorities List (NPL)</u>,
(Feb. 5, 2019) available at https://www.epa.gov/superfund/superfund-national-
priorities-list-npl (last visited May 31, 2019).

[4] The United States prevailed in Phase I by establishing that:  (1) the property
is a facility pursuant to section 9607(b) of CERCLA, (2) PRIDCO falls within
one of four categories of covered persons pursuant to section 9607(a); (3) a
release or threatened release occurred on the property; and (4) the release or
threatened release caused the United States to incur response costs that are
not inconsistent with the National Contingency Plan.  42 U.S.C. § 9607; <u>Acushnet
Co. v Mohasco Corp.</u>, 191 F.3d 69, 75 (1st Cir. 1999) ("By and large, a person
who falls within one of the four categories defined in [section 9607] is exposed
to CERCLA liability.").

a disposition that solidified PRIDCO's status as a liable party

pursuant to CERCLA.  United States v. P.R. Indus. Dev. Co., Case

No. 15-2328, 2019 U.S. Dist. LEXIS 52194, at *10 (D.P.R. Mar. 25,

2019) (Besosa, J.) (holding that PRIDCO failed to "establish by a

preponderance of the evidence that an 'act or omission of a third

party other than an employee or agent of [PRIDCO ]. . . caused the

groundwater contamination'") (citing 42 U.S.C. § 9607(b)(3)).[5]

    The United States also moved for summary judgment regarding

costs, seeking to recover $5,398,161.04 from PRIDCO.  (Docket No.

142 at p. 13.)   In its motion for summary judgment, the United

States:  (1) omitted "five small dollar contracts," (2) referred

to the cis-1, 2-DCE plume as multiple plumes rather than a single

plume,  and  (3)  requested  reimbursement  for  "all  costs,"  a

representation that contradicted its request for "only" past costs

---

[5] Liability pursuant to CERCLA is strict, several, and joint, subject to the
following affirmative defenses: (1) act of God, (2) act of war, (3) act or
omission of a third party other than an employee or agent of the defendant, or
than one whose act or omission occurred in connection with a contractual
relationship, existing directly or indirectly, with the defendant . . . (the
third-party defense"), and (4) any combination of [these three defenses].  42
U.S.C. § 9607(b); In re Hemingway Transp., 993 F.2d 915, 934 (1st Cir. 1992)
(noting that "if [the defendant] did not take all appropriate steps to protect
itself from CERCLA liability, its lack of diligence exposed it to the harsh
consequences of strict, joint, and several liability under CERCLA").  Secured
creditors who hold indicia of ownership merely to protect a security interest
in the contaminated property are also exempt from CERCLA liability.  42 U.S.C.
§ 9601(20)(E).  PRIDCO invoked the affirmative defenses and secured creditor
exemption in Phase I.  (Docket No. 11 at pp. 7—8.)  The Court held, however,
that PRIDCO is ineligible for the act of God and act of war affirmative defenses.
P.R. Indus. Dev. Co., 287 F. Supp. 3d at 147; P.R. Indus. Dev. Co., 2019 U.S.
Dist. LEXIS 52194, at *11—14.  PRIDCO is also ineligible for the secured creditor
exemption.  Id.

in its motion to limit the scope of judicial review.  P.R. Indus.
Dev. Co., 2019 U.S. Dist. LEXIS 25194, at *20—28.  The Court
ordered the United States to "specify which response actions (e.g.
removal actions, remedial actions) underlie the costs that PRIDCO
is purportedly liable for in this action."  Id. at *28.

The United States subsequently provided supplemental
documentation concerning the small dollar contracts, confirming
that the "EPA's indirect costs and prejudgment interest, as [stated
in the motion for summary judgement], are supported and have been
calculated correctly."  (Docket No. 166, Ex. 1 at p. 2.)  The
United States referred to the cis-1, 2-DCE plume as the "TCE-cis-
1,2-DCE Plumes" because TCE is also located on PRIDCO's property.
Id. at p. 6.  The terms "PRIDCO plume," "cis-1, 2-DCE plume," and
"TCE-cis-1,2-DCE plumes" are synonymous.  Id.

The cost calculation in the United States' motion for summary
judgment represents past costs because the "EPA has not yet
commenced the [selected remedy for the site]."  Id. at p. 1.
PRIDCO is liable, however, for "all costs," including future costs.
CERCLA provides that the Court "shall enter a declaratory judgment
on liability for response costs or damages that will be binding on
any subsequent action or actions to recover further response costs
or damages."  42 U.S.C. § 9613(g)(2)(B); see In re Dant & Russell,
Inc., 951 F.2d 246, 249—50 (9th Cir. 1991) ("CERCLA plaintiffs

will spend some money responding to an environmental hazard.  They can then go to court and obtain reimbursement for their initial outlays, as well as a declaration that the responsible party will have continuing liability for the cost of finishing the job.").  Congress recognized that "CERCLA cleanups are protracted ordeals that usually require a series of removal actions spanning several years."  United States v. GE, 670 F.3d 377, 394 (1st Cir. 2012) (citing Am. Cyanamid Co. v. Capuano, 381 F.3d 6, 16 (1st Cir. 2004) (noting that the decontamination of hazardous substances is "done in phases")).  The United States need not relitigate CERCLA liability to recover future costs from PRIDCO.  PRIDCO may, however, contest the amount of response costs in subsequent CERCLA litigation.  United States v. USX Corp., 68 F.3d 811, 819 n.17 (3rd Cir. 1995) ("Essentially, [section 9613(g)(2)] mandates collateral estoppel effect to a liability determination.  Of course, a defendant would remain able to contest the amount of response costs or whether work undertaken was consistent with the national contingency plan.").

According to the United States, the response costs total $5,398,161.04.  (Docket No. 142 at p. 10.)  Because PRIDCO failed to present a genuine issue of material fact as to costs, summary judgment is warranted.

## II.  Summary Judgment Standard

A court will grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it has the potential of determining the outcome of the litigation."  Dunn v. Trs. of Bos. Univ., 761 F.3d 63, 68 (1st Cir. 2014) (internal citation omitted).

The role of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  Tobin v. Fed. Exp. Corp., 775 F.3d 448, 450 (1st Cir. 2014) (internal citation omitted). The party moving for summary judgment has the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact" with definite and competent evidence.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).  The movant must identify "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any'" which support its motion.  Celotex, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).

Once a properly supported motion has been presented, the burden shifts to the nonmovant "to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (internal citation omitted). "When the nonmovant bears the burden of proof on a particular issue, [he or] she [or it] can thwart summary judgment only by identifying competent evidence in the record sufficient to create a jury question." Tobin, 775 F.3d at 450-51. A court draws all reasonable inferences from the record in the light most favorable to the nonmovant, but it disregards unsupported and conclusory allegations. McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014).

## III. Cost Recovery Pursuant to Section 9607(a)(4)(A) of CERCLA

PRIDCO is liable for "all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan." 42 U.S.C. § 9607(1)(4)(A). Accordingly, the CERCLA cost analysis is a function of two variables: (1) the response actions implemented by the EPA, and (2) consistency with the National Contingency Plan ("NCP").

### A. Response Actions

CERCLA sets forth two categories of response actions: (1) removal actions, and (2) remedial actions. 42 U.S.C. § 9601(23) and (24). "Removal" within the meaning of CERCLA refers

to "such actions as may be necessary to monitor, assess, and evaluate the release or threat of hazardous substances." 42 U.S.C. § 9601(23). Remedial actions are "consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment." 42 U.S.C. § 9601(24); see Schaefer v. Town of Victor, 457 F.3d 188, 195 (2d Cir. 2006) (Remedial actions are "generally long-term or permanent containment or disposal programs," and removal actions are "typically short-term cleanup arrangements").

### 1.   Costs Attributed to Removal and Remedial Actions

Removal and remedial costs are defined liberally, encompassing expenses incurred throughoutthe course of decontamination efforts. W.R. Grace & Co. Conn. v. Zotos Int'l, Inc., 559 F.3d 85, 92 (2d Cir. 2009) (citation omitted). Recoverable costs include direct, indirect and oversight costs. United States v. Ottati & Goss, Inc., 900 F.2d 429, 444 (1st Cir. 1990). Direct costs are "[e]xpenditures that are incurred for a particular site." (Docket No. 142, Ex. 9 at p. 11.) Examples of direct costs in the CERCLA context include the salaries of EPA personnel to direct "cleanup activities, the cost of travel to the site, and the cost of contractors performing work at the site." United States v. W.R. Grace & Co., 280 F. Supp. 2d 1149, 1167 (D.

Mont. 2003). Indirect costs "are EPA costs necessary to operate the Superfund program but which are not directly attributable to specific sites, [including] overall program management, administrative support, rent, utilities, and employee fringe benefits." United States v. JG-24, Inc., 331 F. Supp. 2d 14, 49 (D.P.R. 2004) (Acosta, J.).

Recoverable costs also include prejudgment interest and enforcement costs. 42 U.S.C. §§ 9601, 9607(a); United States v. Monsanto Co., 858 F.2d 160, 175 (4th Cir. 1988). Litigation costs fall within the scope of enforcement costs. See United States v. Northeastern Pharmaceuticals & Chemical Co., 579 F. Supp. 823, 852 (W.D. Mo. 1984) (holding that "defendants are jointly and severally liable for, and the plaintiff is entitled to recover, all litigation costs, including attorney fees, incurred by [the] plaintiff" pursuant to CERCLA).

**B.    The National Contingency Plan**

The National Contingency Plan is "essentially the federal government's toxic waste playbook, detailing the steps that government must take to identify, evaluate, and respond to hazardous substances in the environment." Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 137 (2d Cir. 2010); 40 C.F.R. § 300.1 ("The purpose of the [NCP] is to provide the organizational structure and procedure for preparing for and

responding to discharges of oil and releases of hazardous substances, pollutants, and contaminants."). The NCP also sets forth criteria that the EPA must consider in selecting a response action. 40 C.F.R. § 300.415.

The United States is entitled to recover costs arising from response actions that are consistent with the NCP. 42 U.S.C. § 9607(a)(4)(A). PRIDCO need not, however, compensate the United States for costs arising from response actions that are inconsistent with the NCP. See, e.g., United States v. Newmont USA Ltd., 504 F. Supp. 2d 1077, 1085 (E.D. Wash. 2007) ("The Agency for Toxic Substances and Disease Registry's activities at the site were inconsistent with the NCP and therefore the approximately $520,000 in costs associated with that agency's actions are not recoverable"); In re Bell Petroleum Servs., 3 F.3d 889, 907 (5th Cir. 1993) ("Because the decision to implement an [alternate water supply]" was inconsistent with the NCP, "the EPA is not entitled to recover the costs of designing and constructing the [alternate water supply].").

PRIDCO shoulders the burden of demonstrating that the EPA implemented response actions that are inconsistent with the NCP. City of Bangor v. Citizens Communs. Co., 532 F.3d 70, 91 (1st Cir. 2008) ("Actions undertaken by the federal or a state government are presumed to not be inconsistent with the NCP.") To

meet its burden, PRIDCO must "identify a particular provision in the NCP with which a specific response action is inconsistent," and must show that this inconsistency "resulted in demonstrable excess costs for which [PRIDCO] would not be responsible." United States v. Am. Cyanamid Co., 786 F. Supp. 152, 162-63 (D.R.I. 1992); United States v. Hardage, 982 F.2d 1436, 1444 (10th Cir. 1992) ("The only way a responsible party can escape liability for the government's costs incurred at a particular site is to demonstrate that the government's response actions — i.e., removal and remedial actions – underlying the costs, are inconsistent with the NCP.").

        The EPA's response actions are subject to an arbitrary and capricious standard of review.  42 U.S.C. § 9613(j); United States v. JG-24, Inc., 478 F.3d 28, 32 (1st Cir. 2007).  The arbitrary and capricious standard is "highly deferential" and "narrow;" "the agency's actions are presumed to be valid," and the Court "may not substitute its judgment for that of the agency." River St. Donuts, LLC v. Napolitano, 558 F.3d 111, 114 (1st Cir. 2009).  Indeed, the burden that PRIDCO must overcome in defeating the presumption of consistency with the NCP is "heavy."  Legal Envtl. Assistance Found. v. EPA, 276 F.3d 1253, 1265 (11th Cir. 2001) (citation omitted); compare Wash. State Dep't Transp. V. Wash Nat. Gas Co., 59 F.3d 793, 802 (9th Cir. 1995) (holding that the government acted in an arbitrary and capricious manner in part

because the "lead representative on the coordination team handling the contamination project was not even aware that the NCP existed"), with United States v. Akzo Nobel Coatings, 990 F. Supp. 892, 897 (E.D. Mich. 1998) ("[W]hile perhaps EPA did not select the 'best' remedy available to it, my review of EPA's decision should not be a judicial 'second guess,' but rather I must confine it to a determination whether the remedy was rationally chosen based upon the information available at the time the remedy was selected.").

Judicial review of "any issues concerning the adequacy of any response action" is limited to the administrative record. 42 U.S.C. § 9613(j). The Court's "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973); JG-24, Inc., 478 F.3d at 33—34 ("Under CERCLA, judicial review is limited to the administrative record as it existed at the time of the challenged agency action.").

## IV. The EPA Selected a Remedy for the Cis-1, 2-DCE Plume Pursuant to the National Contingency Plan

PRIDCO failed to set forth a genuine issue of material fact as to whether the EPA's removal and remedial actions were inconsistent with the NCP. 42 U.S.C. § 9607(a)(4); see Carson Harbor Hill, Ltd. v. Uncocal Corp., 287 F. Supp. 2d 1118, 1154

(C.D. Cal. 2003) ("While compliance with the NCP is a fact question, it can, like any other fact question, be resolved on summary judgment where the evidence is undisputed."). Having reviewed the record and relevant NCP provisions, the Court is satisfied that the EPA did not act in an arbitrary and capricious manner. Accordingly, the Court concludes as a matter of law that the EPA's actions were consistent with the NCP. See Trafalgar Capital Assocs. v. Cuomo, 169 F.3d 21, 26 (1st Cir. 1998) ("While [the arbitrary and capricious] standard of review is highly deferential, it is not a rubber stamp.") (citation and internal quotation omitted).

The presence of hazardous substances in Maunabo's water supply prompted the EPA to conduct a preliminary assessment, remedial investigation, and feasibility study. (Docket No. 148, Ex. 1 at pp. 1 and 4.) "The purpose of the remedial investigation (RI) is to collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives." 40 C.F.R. § 300.430(d). The feasibility study sets forth "remedial action options that can be presented to a decision-maker." 40 C.F.R. § 300.430(e). The EPA determined that the groundwater contamination posed "a significant threat to human health or the environment; therefore, remediation [was] necessary." Docket No. 139, Ex. 2 at p. 4.; see 40 C.F.R. § 300.1

("[The] purpose of the remedy selection process is to implement remedies that eliminate, reduce, or control risks to human health and the environment").

In 2012, the EPA issued the Record of Decision ("ROD"), setting forth the "factual and legal basis for selecting the [applicable] remedy." (Docket No. 139, Ex. 2 at p. 4.)[6] The ROD presents a comparative analysis of four remedial alternatives. Id. at pp. 33-42.[7] Pursuant to the NCP, the EPA assessed each alternative according to nine criteria: (1) overall protection of human health and the environment, (2) compliance with applicable federal and state law, (3) long-term effectiveness and permeance,

---

[6] The EPA is required to issue a Record of Decision. 42 U.S.C. § 9617; 40 C.F.R. section 300.430. These documents "provide a comprehensive description of site conditions, the scope of the action, and the Selected Remedy, cleanup levels, and the reason for selecting the remedy." A Guide to Preparing Superfund Proposed Plans, Records of Decision, and Other Remedy Selection Decision Documents, (July 1999) (available at https://www.epa.gov/superfund/record-decision-rod-guidance) (last visited May 31, 2019).

[7] The four alternatives include: no action ("Alternative 1"), monitored national attenuation ("MNA") for each plume ("Alternative 2"), air sparging for the cis-1, 2-DCE plume, and MNA for the two plumes located beyond PRIDCO's property ("Alternative 3"), and in-situ bioremediation for the cis-1, 2-DCE plume and MNA for the PCE and 1, 1-DCE plumes ("Alternative 4"). (Docket No. 139, Ex. 2 at pp. 33—35.) According to the ROD, "air sparging is a technology in which air is injected into the subsurface through sparge points. The injected air acts to remove or 'strip' the VOCs from the groundwater." (Docket No. 139, Ex. 2 at p. 34.) Monitored Natural Attenuation is a "cleanup method that relies on physical, chemical, or biological processes that, under favorable conditions, act without human intervention to reduce the amount, toxicity, or mobility of contamination in soil of groundwater." United States Environmental Protection Agency Use of Monitored Natural Attenuation at Superfund, RCRA Corrective Action, and Underground Storage Tank Sites, Directive 9200.4-17P (April 21, 1999) (available at https://www.epa.gov/sites/production/files/2014-02/documents/d9200.4-17.pdf) (last visited May 31, 2019). Bioremediation is "a process by which microorganisms are added to a hazardous waste site to allow bioactivity to degrade the contaminants contained therein." Allied Signal, Inc. v. Amcast Int'l Corp., 177 F. Supp. 2d 713, 745 n.66 (S.D. Ohio 2011).

(4)   reduction of toxicity, mobility of volume through treatment,

(5)  short-term  effectiveness,  (6)  implementability,  (7)  cost,  (8)

state  acceptance,  and  (9)  community  acceptance.    40  C.F.R.  §

300.430(e)(9)(iii).   The protection of human health and compliance

with  federal  and  state  law  are  threshold  criteria  that  "must  be

met  in  order  [for  the  proposed  alternative]  to  be  eligible  for

selection."   40 C.F.R. § 300.430(f)(i).   The remaining criteria

are  "primary  balancing"  and  "modifying"  considerations  that  the

EPA must assess, but are not dispositive. Id.

        The  remedy  selected  by  the  EPA  incorporates  air  sparging  for

the  cis-1,  2-DCE  plume  and  monitored  natural  attenuation  for  the

PCE  and  1,  1-DCE  plumes  (hereinafter,  "Alternative  3").    (Docket

No.  101,  Ex.  6  at  p.  75.)    The  EPA  concluded  that  Alternative  3

provided  "adequate  control  of  risk  to  human  health,"  and  complied

with  federal  and  state  law  in  satisfaction  of  the  threshold

criteria.    (Docket  No.  139,  Ex.  2  at  pp.  36—38.)    An  analysis  of

Alternative  3  pursuant  to  the  primary  balancing  and  modifying

criteria  demonstrated  that  air  sparging  would:  "reduce

concentrations to below the [preliminary remediation goals] within

a  reasonable  timeframe,"  "be  the  most  effective  in  reducing

toxicity  and  volume  of  contamination,"  render  "short  term  impacts

to  the  local  community,"  be  subject  to  implementation,  cost

approximately $4.9 million, garner approval from the Commonwealth

of Puerto Rico, and gain acceptance from the community. (Docket No. 139, Ex. 2 at pp. 36—38.)[8]

The Court will not subvert the technical and scientific expertise of the EPA. The record is devoid of any evidence suggesting that the selection of Alternative 3 deviated from the NCP, or that the EPA acted arbitrarily and capriciously. Although the arbitrary and capricious inquiry must "be searching and careful," evidence presented in support of the United States' motion for summary judgment demonstrates that Alternative 3 is "rational" and "makes sense." Citizens to Preserve Overton Park, Inc., v. Volpe, 401 U.S. 402, 416 (1971) (in reviewing an agency's decision the Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment"); Penobscot Air. Servs., Ltd. v. FAA, 164 F.3d 713, 720 (1st Cir. 1999) (citations omitted); United States v. Northeastern Pharm. & Chem. Co., 810 F.2d 726, 748 (8th Cir. 1986) ("Because determining the appropriate removal and remedial action involves specialized knowledge and expertise, the choice of a particular cleanup method is a matter within the discretion of the EPA.").

_____

[8] The EPA estimated Alternative 1 would cost nothing, Alternative 2 would cost $2.5 million, and Alternative 4 would cost $2.8 million. (Docket No. 139, Ex. 2 at p. 38.) The Puerto Rico Environmental Quality Board concurred with the EPA's "preferred alternative recommendation for the Maunabo Ground Water Contamination Site." Id. at p. 58.

## V.   There is No Issue of Material Fact that the United States Incurred $5,398,161.04 in Response Costs

The United States requests $5,398,161.04 from PRIDCO. (Docket No. 142. at p. 13.)  This amount represents the direct and indirect costs, litigation costs, and prejudgment interest.  Id. The NCP provides that:

> During all phases of response, the lead agency shall complete and maintain documentation to support all actions taken under the NCP and to form the basis for cost recovery. In general, documentation shall be sufficient to provide the source and circumstances of the release, the identity of responsible parties, the response action taken, accurate accounting of federal, state, or private party costs incurred for response actions, and impacts and potential impacts to the public health and welfare and the environment.

40 C.F.R. § 300.160.  The NCP does not define the terms "accurate accounting" or "sufficient" documentation.  See United States v. Chrysler Corp., 168 F. Supp. 2d 754, 769 (N.D. Ohio).  "Detailed cost summaries, supporting data, and other competent evidence," however, is sufficient to establish the amount of recoverable costs in a CERCLA action.  United States v. Findett Corp., 200 F.3d 842, 849 (8th Cir. 2000).[9]

---

[9] See also, United States v. Bell Petroleum Servs., Inc., 734 F. Supp. 771, 781 (W.D. Tex. 1990) (holding that the "failure to provide descriptive documentation [in a CERCLA cost recovery action] does not make the Government's accounting inaccurate and even if it did, disallowance of costs for that reason is too harsh a sanction for the omission, if any, involved"); United States v. Saporito, Case No. 07-3169, 2011 U.S. Dist. LEXIS 66456, at *10 (N.D. Ill. 2011) (granting the United States' summary judgment motion for costs in a CERCLA action, because the defendant failed to controvert cost reports and declarations from EPA and Department of Justice officials).

A.  **Indirect Costs**

Christopher Osborne ("Osborne") is employed by the EPA as a Senior Financial Advisor in the Office of the Controller. (Docket No. 142, Ex. 11 at p. 2.)  Osborne submitted a sworn declaration, setting forth the methodology employed by the United States to calculate the indirect costs attributable to the site. Id.  The EPA developed an indirect cost methodology pursuant to the Statement of Federal Financial Accounting Standard #4, issued by the Office of Management and Budget to promulgate the cost accounting principles for the federal government.  Id. at p. 6. The EPA determines "the site-specific direct costs within [a specific EPA] region to calculate the indirect costs associated with those site-specific direct costs."  Id. at p. 15.  Osborne provides the following example: "[I]f a particular organization represents 10% of the total direct costs, that organization would receive as an allocation 10% of the [indirect] costs."  Id. at p. 14.[10]  According to Osborne, the indirect cost methodology reflects "a fair and equitable allocation of non-site-specific contractor costs to the Maunabo Urbano Public Wells Site and is consistent

_____

[10] The EPA maintains ten regional offices.  Puerto Rico, the Virgin Islands, New Jersey, New York and eight tribal nations constitute Region 2.  See Organization of EPA's Region 2 Office in New York City, https://www.epa.gov/aboutepa/visiting-regional-office (last visited May 31, 2019).

with generally accepted cost accounting concepts and principles."
Id. at p. 22.

   **B.  Direct Costs**

        Luis Santos ("Santos") is the Remedial Project Manager
(hereinafter, "RPM") for the Caribbean Environmental Protection
Division for Region 2.  (Docket No. 101, Ex. 2 at p. 1.)  As the
RPM, Santos has reviewed the relevant records, reports and data
compilations relating to the site.  Id.  Beginning in 2005, the
EPA performed several removal and remedial actions.  Id. at p. 2.
These actions include: a preliminary assessment and site
inspection, placing the site on the National Priorities List,
issuing a remedial investigation and feasibility report, issuing
the ROD, completing a pre-design investigation and pilot study to
characterize "the extent of the PRIDCO Property cis-1, 2-DCE
plume," preparing a design analysis report to identify the
"technical aspects to construction of the air sparging remedy,"
and issuing the final remedial design report for the air sparging
remedy.  (Docket No. 166, Ex. 2 at p. 2.)  The EPA commissioned
various contractors, including CDM Smith, Inc., Lockheed Martin,
and Alion Science and Technology Corporation, to complete the pre-
design investigation and other response actions.  (Docket No. 101,
Ex. 2 at p. 2; Docket No. 166, Ex. 2 at p. 6.)

Santos submitted an itemized cost summary for the site, including the cis-1, 2-DCE, PCE and 1, 1-DCE plumes. (Docket No. 166, Ex. 2 at p. 6.)   The costs include:

EPA Payroll: $518,598.24

EPA Travel:    $1,330.27

State Cooperative Agreement:  $36,543.93

EPA-Approved Laboratory Fees:  $490,036.01

Contractor Costs:  $3,693,494.34

Miscellaneous Costs:  $31.50

Indirect Costs:  $1,815,510.53

Id.  The total amount of direct and indirect costs for the Maunabo Urbano Public Wells Site is $6,555,544.82, "although the bulk of these costs are related to the PRIDCO cis-1, 2-DCE plume." Id. at p. 2. Litigation costs and prejudgment interest are not included in this amount.  Id.

C.  **Litigation Costs**

The United States submitted a sworn declaration from William Kime ("Kime"), a certified public accountant. (Docket No. 142, Ex. 10.)  Kime assists the Environmental and Natural Resources Division ("ENRD") of the Department of Justice in accumulating, processing, and reporting litigation costs.  Id. at p. 2.  The ENDR attorneys report the hours they allocate to a specific case, which are included in the direct litigation cost analysis.  Id. at

p. 4.  Direct litigation costs also include expenses for travel,
expert witnesses, and deposition transcripts.  Id.  Indirect
litigation costs such as paralegal administrative time,
secretarial support, utilities, and training are divided by "a
base consisting of the total ENRD direct labor costs . . . to
produce a division-wide indirect cost rate by fiscal year."  Id.
at p. 5.  The division-wide indirect costs are allocated among
CERCLA cases according to the direct costs.  Id.  Kime calculated
that from October 1, 2015 to September 30, 2017, the total
litigation cost relating to this action is $529,441.70.  Id.

### D.  Prejudgment Interest

Wiley Wright ("Wright"), a certified public accountant,
evaluated the costs incurred by the EPA regarding the Maunabo
Urbano Public Wells Superfund Site.  (Docket No. 149, Ex. 9; Docket
No. 166, Ex. 1.)  Wright concluded that the final prejudgment
interest is $181,899.67 as of March 8, 2018.  (Docket No. 142, Ex.
9 at pp. 20—22.)  He arrived at this amount by multiplying the sum
of all principal expenditures by the Superfund interest rate.  See
42 U.S.C. § 9607(a)(4)(D) ("the rate of interest on the outstanding
unpaid balance of the amounts recoverable under this section shall
be the same rate as is specified for interest on investments of
the Hazardous Substance Superfund").

### E.    Total Amount of Response Costs for the Cis-1, 2-DCE Plume

According to Wright, the EPA has incurred $7,315,546.22 in response costs and prejudgment interest as of February 28, 2018. (Docket No. 142, Ex. 9 at p. 7.)  PRIDCO is not liable, however, for the response costs incurred by the EPA in connection with the PCE and 1, 1-DCE plumes of contaminated groundwater.  Based on the EPA's cost summaries, cost allocations from CDM Federal Programs Corporation, supporting documentation, and prejudgment interest summary, the total response cost for the cis-1, 2-DCE plume is $5,398,161.04 as of February 28, 2018.  Id. at p. 8.

## VI.  PRIDCO's Arguments in Opposition to the United States' Motion for Summary Judgment are Unavailing

The linchpin of PRIDCO's argument in opposition to summary judgment is that the United States withheld "detailed information regarding costs and allocations" in violation of Federal Rule of Civil Procedure 26 ("Rule 26").  (Docket No. 153 at p. 16.)  This argument is unconvincing.

PRIDCO claims that the expert reports by Wright, Osborne, and Kime are insufficient because they lack specific cost analyses regarding the cis-1, 2-DCE plume.  (Docket No. 153 at pp. 18—20.) Rule 26 required the United States to disclose a written report identifying any witness "retained or specially employed to provide expert testimony in the case or one whose duties as the party's

employee regularly involve giving expert testimony." Fed. R. Civ.

P. 26(a)(2).  This report must set forth a "complete statement of

all opinions the witness will express and the basis and reasons

for them," and the "facts or data considered by the witness in

forming them."  Id.

PRIDCO's allegations of discovery violations are unwarranted

and untimely.  PRIDCO cites no authority for the proposition that

expert reports must contain a specific cost analysis.  Osborne,

Wright and Kime, however, set forth the data and facts that form

the basis of their opinions in accordance with Rule 26.[11]  Fed. R.

Civ. P. 26(a)(2).  See Nixon-Egil Equip. Co. v. John A. Alexander

Co., 949 F. Supp. 1435, 1446 (C.D. Cal. 1996) (holding in a CERCLA

action that "the expert does explain the basis for his opinion; he

refers to the reports he has read and summarizes the physical

theory . . . Thus, the report is adequate under Rule 26.").

Pursuant to the Court's order, PRIDCO was to receive the

expert reports from Osborne, Wright and Kime on April 2, 2018.

(Docket Nos. 136.)  The United States disclosed a cost report on

March 1, 2018 to provide PRIDCO with "an idea of past costs EPA

---

[11] See Wright Report, Docket No. 149, Ex. 9 at p. 20—22 (listing the documents,
data, or other information considered in forming his opinion); Osborne Report,
Docket No. 142, Ex. 11 at p. 4 ("Attachment B lists the documents [Osborne]
considered in forming his expert opinion); Kime Report, Docket No. 142, Ex. 10
at p. 5 (attaching a summary setting forth "the total costs for this Site
incurred by ENRD").

incurred responding to the Site." (Docket No. 153, Ex. 1 at p. 1.) PRIDCO then requested a report that isolated the costs incurred in response to the cis-a, 2-DCE plume. (Docket No. 153 at p. 16.) Subsequently, the United States timely disclosed the expert cost reports. (Docket No. 158 at p. 6.) PRIDCO did not present an expert witness regarding costs, nor did PRIDCO depose the United States' cost experts. (Docket No. 153 at p. 16.) Additionally, PRIDCO did not file a motion to compel the disclosure of cost-related discovery. Not until the eve of the deadline to oppose the United States' motion for summary judgment did PRIDCO raise an alleged Rule 26 violation. (Docket No. 158 at p. 5.) In light of these circumstances, the Court is unconvinced that a Rule 26 violation occurred, or that any such violation would justify denying the United States' motion for summary judgment. See Fernández-Salicrup v. Figueroa-Sancha, 790 F.3d 312, 322 (1st Cir. 2015) (holding that "even if Defendants were intentionally delaying the disclosure of necessary documents, there is nothing in the record suggesting that Plaintiffs timely brought the issue before the district court in an attempt to remedy the situation"); Roosevelt Cayman Asset Co. v. Robles, Case No. 15-1308, 2017 U.S. Dist. LEXIS 49603 *9 ("Defendants' unsupported claim as to a discovery violation is not sufficient to defeat summary

judgment.") (López, Mag. J.).   Accordingly, the United States'

motion for summary judgment is **granted.**

## VII. Conclusion

For the reasons set forth above, the United States' motion

for summary judgement is **GRANTED.**   (Docket No. 142.)   The United

States shall submit a proposed judgment that reflects the current

amount owed by PRIDCO, including prejudgment interest, **no later**

**than June 14, 2019.**

**IT IS SO ORDERED.**

San Juan, Puerto Rico, May 31, 2019.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE